## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Prime Core Technologies Inc., *et al.*,[1] | ) | Case No. 23-11161 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |
| PCT Litigation Trust, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Proc. No. 24-_____ (JKS) |
| v. | ) | |
| | ) | |
| Digital Asset Redemption, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

The PCT Litigation Trust ("<u>Plaintiff</u>" or "<u>Prime</u>")[2] established in the above-captioned

chapter 11 cases (the "<u>Chapter 11 Cases</u>"), files this complaint (the "<u>Complaint</u>") against

Defendant Digital Asset Redemption, LLC ("<u>DAR</u>" or "<u>Defendant</u>") (together with Prime, the

"<u>Parties</u>"), pursuant to sections 547 and 550 of title 11 of the United States Code, 11 U.S.C. §§ 101

*et seq.* (the "<u>Bankruptcy Code</u>"), seeking to avoid and recover not less than $9,947,500.00 U.S.

dollars ("<u>USD</u>") that Prime transferred to Defendant DAR during the 90-day period prior to

---

[1]    The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "<u>Debtors</u>").  The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]    The PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. The PCT Litigation Trust has been vested with claims and causes of actions previously held by the Debtors.  For purposes of this Complaint, we refer to the Debtors and PCT Litigation Trust collectively as "Prime" unless otherwise specified.

commencement of the Chapter 11 Cases[3] plus interest, attorneys' fees, and costs, and alleges as follows:

## INTRODUCTION

1.      Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat, which is commonly referred to as "on and off ramp." Prime was shut down by the Nevada Financial Institutions Division ("Nevada FID") in June 2023 and filed for bankruptcy in August 2023. Most of Prime's customers suffered losses and have yet to receive any of the crypto or fiat owed to them. But DAR lost nothing because Prime transferred the $9,947,500.00 it owed to DAR right before Prime filed the Chapter 11 Cases (the "Transfers"). Pursuant to sections 547 and 550 of the Bankruptcy Code, these Transfers must be returned.

2.      DAR provides advisory services in connection with cybercrimes. Part of DAR's business is facilitating ransomware payments. Because DAR did not itself have the requisite federal money service business ("MSB") registration and state money transmitter licenses (each, an "MTL") to make those payments for its customers, it used Prime as a payment processor and "payment rail" to facilitate those payments.

3.      DAR never sought or received any trust or fiduciary services from Prime. To the contrary, DAR explicitly engaged Prime to facilitate ransomware payments for DAR. DAR provided Prime with crypto and fiat and would later direct Prime to transfer assets to others. DAR also had the ability to "withdraw" assets, which meant that it would request that Prime transfer to DAR the value of assets DAR previously provided to Prime.

---

[3]  Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's non-insider preference period (the "Preference Period") occurred between May 16, 2023 and the Petition Date.

4.      The agreements that governed Prime and DAR's relationship included: (i) Prime Trust Order Form, effective May 1, 2023 (the "Order Form")[4]; (ii) Prime Trust Master Services Agreement (the "MSA"), dated August 30, 2022[5]; and (iii) Service Schedule for Prime Trust Custodial Services (the "Custodial Agreement")[6], dated May 13, 2022 (collectively, the Custodial Agreement with the Order Form and the MSA, the "Agreements").

5.      The Agreements make it clear that: (i) DAR maintained a debtor-creditor relationship with Prime; (ii) the Transfers from Prime to DAR during the Preference Period were transfers of estate property; and (iii) the Transfers must now be returned to the Debtors' estates pursuant to section 547 of the Bankruptcy Code.

6.      Although Prime was a Nevada state-chartered trust company, the Parties expressly agreed no fiduciary relationship existed between them.  Specifically, the MSA provides that it "*does not create a . . . fiduciary or employment relationship between the parties*."  Ex. B, MSA, § 14.1 (emphasis added).

7.      In the Custodial Agreement, the Parties also agreed that Prime was entitled to "*pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such [assets]. . . with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency[.]*"  Ex. C, Custodial Agreement, § 2.7(b) (emphasis added).

8.      Prime also engaged third-party experts to determine whether DAR and other customers' assets could be traced and segregated.  As stated in the attached expert declaration and as reflected by blockchain data and bank account statements, even if DAR were somehow able to

---

[4]      A copy of the Order Form is attached as Exhibit A.

[5]      A copy of the MSA is attached as Exhibit B.

[6]      A copy of the Custodial Agreement is attached as Exhibit C.

establish that the Agreements formed a trust relationship, it would be impossible for DAR to trace the fiat that it initially transferred to Prime from other assets provided to Prime or assets that Prime generated from its business operations. *See* Declaration of James P. Brennan in Support of Prime's Complaint Against Digital Asset Redemption, LLC (the "Brennan Decl.").[7]

9.      Blockchain data and bank account statements reflect that the Transfers that DAR received during the Preference Period were not the original fiat that DAR provided to Prime. Instead, these Transfers came from omnibus bank accounts that contained commingled fiat that had been provided to Prime by other customers and fiat Prime generated from its own business operations. It is impossible to identify and segregate the fiat that DAR provided to Prime from the fiat that other customers transferred to Prime or the fiat that Prime generated from its business activities.[8]

10.     Moreover, Prime's internal recordkeeping, including its "general ledger" (the "Ledger"), was errantly and later intentionally corrupted. Based on internal audit reports, sworn testimony, and the Brennan Decl., Prime's internal accounting and Ledger cannot be relied upon to track and segregate the fiat that DAR had transferred to Prime.

11.     When Prime discovered it was unable to access a digital wallet holding a substantial amount of crypto (the "98f Wallet"),[9] it used fiat that other customers had provided to Prime to purchase ETH to satisfy withdrawal requests.

12.     Prime executives admitted that they intentionally falsified internal records of these replacement ETH purchases. They admitted that they manufactured fake wire transfer entries so

---

[7]    A copy of the Brennan Decl. is attached as Exhibit D.

[8]    *See generally id.*

[9]    The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f".

that it would appear like the entity that Prime purchased ETH from to satisfy withdrawal requests had been wiring fiat currency to Prime when no such wire transfers occurred.

13.     When questioned about the fake wire transfer entries, one Prime insider explained:



Deposition of ████████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "████ Dep."), 164:22–165:10 (emphasis added).[10]

14.     Due to these falsified wire transfer entries, Prime's use of fiat to make replacement ETH purchases to satisfy withdrawal requests, and Prime's overall inability to properly reconcile and record transactions, Prime cannot trace fiat currency to any specific deposits provided by any particular customer.  Moreover, Prime had a more than $82 million shortfall in the fiat that it owed its fiat customers, including DAR.

15.     Thus, the Transfers Prime sent to DAR during the Preference Period must be returned as a matter of law.  Accordingly, Prime seeks the return of all Transfers from Prime to DAR during the Preference Period pursuant to sections 547 and 550 of the Bankruptcy Code,

---

[10] Prime has redacted information categorized as "Confidential" and "Highly Confidential – Professionals' Eyes Only" in this Complaint pursuant to the *Stipulated Protective Order* approved by the Court in the Chapter 11 Cases [Docket No. 323].

which Transfers amount to not less than $9,947,500.00 USD in the aggregate, *plus* interest, attorneys' fees, and costs.

## **PARTIES**

16.    Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors* [Docket No. 592-1] (as amended, supplemented, or otherwise modified, the "Plan"), which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 644]. The Plan was consummated on January 5, 2024 (the "Effective Date").[11] On the Effective Date, the PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to the PCT Litigation Trust. *See* Plan, § 6.21. The PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn. *See id.*, § 1.118.

17.    Defendant DAR is an Illinois limited liability company. DAR maintains a registered address in Chicago, Illinois, and is headquartered in Chicago, Illinois.

18.    At all times relevant to this Complaint, DAR was not registered as an MSB with the Financial Crimes Enforcement Network ("FinCEN").

19.    DAR did not register as an MSB with FinCEN until May 2024, and, in its application, states that Hawaii is the only place in which it conducts money transmission. DAR has never obtained any state MTLs.

---

[11]    *See* Docket No. 694.

20.    In the *Second Amended Plan Supplement with Respect to Debtors' Amended Joint Chapter 11 Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket No. 539] (the "Plan Supplement"), Prime identified preference claims against Defendant DAR as "Exempted Preference Claims", and thus, these claims were not released on the Effective Date of the Plan.[12]

## JURISDICTION AND VENUE

21.    The Court has subject matter jurisdiction over this adversary proceeding (the "Adversary Proceeding") pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code.  Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor."  *See* Plan, § 12(c).  This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust."  *Id.*, §§ 12(s), (u).  As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

22.    This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter final orders in connection with the matters contained herein.

---

[12]    Prime filed the Plan Supplement under seal.  [*See* Docket No. 539.]  Prime reserves its right to maintain the confidentiality over the remainder the "Exempted Preference Claims" identified in the Plan Supplement.

23.     In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Prime confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the Parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

24.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

25.     This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and sections 105, 542, 547, and 551 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

26.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens". Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  Bitcoin ("BTC") and Ethereum ("ETH") are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies.

27.     All cryptocurrencies exist on a "blockchain."  A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all the cryptocurrency transactions that

occurred on the blockchain at a particular point in time. The "blocks" are all reflected on the blockchain and are ordered by date in a "chain"— a "block"-"chain."

28.     There are many different blockchains. The first and most popular blockchain was the BTC blockchain. Another important blockchain is the Ethereum blockchain, which launched the popular cryptocurrency ETH. The Ethereum blockchain made it relatively easy to create new cryptocurrencies that would also reside on the Ethereum blockchain. Those cryptocurrencies created on the Ethereum blockchain are referred to as "ERC-20" tokens.

29.     Users generally hold crypto in digital wallets. On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys." These public keys are 40-digit alphanumeric strings. Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is traded or any time a smart contract is used.

30.     "Private keys" are essentially individual passwords used to denote ownership in a particular blockchain address. Like public keys, private keys similarly consist of multi-digit alphanumeric strings. However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are only known by the owner of the digital wallet and are used by the owner to access and manage the digital wallet.

31.     Many digital wallets and private keys are "custodial," which means that they are possessed by a third party, such as a centralized crypto exchange. In contrast, "self-hosted" digital wallets do not have third parties who take custody of the crypto.

32.     Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

33.     Digital wallet owners can choose to store their private keys in numerous ways. They can write down private keys on a piece of paper or store them on a personal computer device, although these methods are highly inadvisable due to the attendant risks of destruction, loss, or theft.

34.     Digital wallet owners also can use physical hardware devices to store private keys to access digital wallets, which is a more secure method.  These types of physical hardware devices are provided by companies such as Trezor:



35.     Digital wallet owners using hardware devices need to be in possession of their physical hardware devices to access their digital wallets.  If owners lose a physical hardware device, they may still be able to access the crypto stored on their digital wallets by transferring the ability to sign transactions from the digital wallet to another physical hardware device.  To do so, the owner must know the original digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as the password to access the private keys necessary to effectuate transactions in crypto.  Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

36.     Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed.  They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" address.  If someone sends crypto to a "forwarder" address, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet address.

## GENERAL ALLEGATIONS

**A.     Prime's Business Operations**

37.     Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

38.     Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.  In the years that followed, as the crypto markets and industry grew substantially, Prime shifted its focus away from traditional assets and towards the crypto industry.

39.     Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining state MTLs required to conduct money transmission.

40.     Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service" to crypto companies and serving as an "on-and-off ramp" and "payment rail" for crypto companies.

41.     Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships without having to expend the time, effort, and financial resources necessary to obtain their own MTLs.

42.     Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

**B.     DAR Used Prime's Services to Facilitate DAR's Ransomware Payments**

43.     DAR provides advisory services regarding cyber extortion, ransomware, and other types of cybercrimes.  As is most relevant here, DAR also facilitates ransom payments for its clients.

44.     DAR assists organizations in "understand[ing] and navigat[ing] the harsh reality of the cyber extortion economy."  *See The DAR Team*, DIGITAL ASSET REDEMPTION, https://www.digitalassetredemption.com/about#.

45.     DAR states that it "helps global organizations defend, prepare, and respond" to cyber extortion in ways that are "outside the boundaries of conventional cyber defenses."  *Id.*

46.     The services that DAR provides to its clients include "[r]ansomware preparedness," "[r]ansomware response," and "[t]hreat intelligence."  *See Services*, DIGITAL ASSET REDEMPTION, https://www.digitalassetredemption.com/about.

47.     These services include DAR negotiating and facilitating ransomware payments.

48.     DAR typically accepts USD from its clients and converts the USD into crypto to make the ransomware payments on behalf of its clients.

49.     Various regulators in the United States have stated that facilitating crypto and fiat ransomware payments is a form of "money transmission" that requires a federal MSB and state MTLs.

50.     For example, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") has issued guidance concerning "the sanctions risks associated with ransomware payments in connection with malicious cyber-enabled activities."  *See Updated*

*Advisory on Potential Sanctions Risk for Facilitating Ransomware Payments*, OFAC (Sep. 21, 2021), https://ofac.treasury.gov/media/912981/download?inline.

51.     Similarly, FinCEN issued guidance "to alert financial institutions of predominant trends, typologies, and potential indicators of ransomware and associated money laundering activities." *See Advisory on Ransomware and the Use of the Financial System to Facilitate Ransom Payments*, FinCEN Advisory No. FIN-2021-A004 (Nov. 8, 2021), https://www.fincen.gov/sites/default/files/advisory/2021-11-08/FinCEN%20Ransomware%20 Advisory_FINAL_508_.pdf.

52.     Specifically, FinCEN warns that "facilitat[ing] ransomware payments to cybercriminals, often by directly receiving customers' fiat funds, exchanging them for [crypto] and then transferring the [crypto] to criminal-controlled accounts . . . could constitute money transmission." *Id.* at 4.  As such, FinCEN advises that "[e]ntities engaged in" such activities "are required to register as an MSB with FinCEN, and are subject to [Bank Secrecy Act] obligations, including filing [Suspicious Activity Reports]." *Id.*

53.     FinCEN also states that it "will not hesitate to take action against entities and individuals engaged in money transmission or other MSB activities if they fail to register with FinCEN or comply with their AML obligations" in connection with the facilitation of ransomware payments.  *Id.*

54.     Registration as a MSB is relatively easy to obtain.

55.     During the relevant time periods, DAR was not a registered MSB with FinCEN.

56.     State MTL applications are more burdensome to obtain than a MSB as they often involve significant regulatory scrutiny, are costly in both time and money, and carry no guarantee that an applicant will be approved for an MTL by state regulators.

57.     DAR has never held any state MTLs, including during the relevant time periods.

58.     Thus, DAR needed Prime to facilitate transactions because DAR itself did not obtain or maintain the requisite federal MSB registrations or state MTLs during the relevant time periods.  By entering a debtor-creditor customer relationship with Prime in or around the fall of 2020, DAR successfully obviated the need to register as an MSB with FinCEN and/or hold any MTLs.

59.     More specifically, DAR could facilitate its ransomware payments through Prime—*i.e.*, engage in money transmission—thereby avoiding the need to incur the costs or be subjected to the scrutiny and oversight attendant to DAR obtaining its own state and federal licenses.

60.     In or around the fall of 2020, Prime and DAR began their business relationship.

61.     DAR contracted with Prime so that Prime could execute transactions for DAR.

62.     The arrangement between DAR and Prime is commonly referred to as a "payment rail," "rail," or "money transmitter as a service."

63.     On October 12, 2020, Mark Majd ("Majd"), DAR's Head of Risk and Managing Partner, contacted Prime about potentially engaging Prime's services in light of then-recent regulatory guidance that had "caused some compliance-related scrambling throughout the industry":

From: Mark Majd <mark.majd@digitalassetredemption.com>
Date: Mon, Oct 12, 2020 at 12:25 PM
Subject: compliance as a service
To: ▮▮▮▮▮▮▮▮▮▮▮@primetrust.com>, Matthew Leidlein <matthew.leidlein@digitalassetredemption.com>

Hi ▮▮▮▮
Hope all is well with you.

You're probably aware, but in case you're not, FinCEN, OFAC, and the DOJ put out crypto-related guidances over the last two weeks that have caused some compliance-related scrambling throughout the industry.

I noticed that you offer compliance-as-a-service. Can we talk about that in some details? What we need is AML/KYC and also the ability to conduct OFAC sanctions checks on various actors.

Also, we believe there is a large opportunity in this space for the people who do it right and we think Prime could help us capture a very large portion of this. But it all hinges around the following question: would Prime be comfortable with DAR sending money directly to a threat actor from Prime?

We obviously have a lot to discuss. Can we get on the phone later this week? Wednesday or Thursday morning work for you?

Thanks!

Mark

64.    Majd communicated DAR's interest in engaging Prime's "compliance-as-a-service".  DAR never stated to Prime that it was seeking any trust or fiduciary services.

65.    During the entirety of DAR and Prime's relationship, DAR never sought or received any trust or fiduciary services from Prime, nor did DAR ever convey to Prime that it was seeking any trust or fiduciary services.

66.    Prime's exclusive role as a service provider to DAR was to accept assets transferred to it from DAR, to make payments to third parties upon DAR's request, and, if DAR did not request such payments, then Prime would owe DAR the fiat that DAR had provided to Prime.

**C.    The Agreements**

67.    The Agreements governed the Parties' relationship during the Preference Period.

68.    At all relevant times, the Agreements were valid and enforceable contracts governed by Nevada law.  *See* Ex. B, MSA, § 13.1 ("The Agreement is governed by, and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.").

69.    Prime and DAR executed the Order Form in May 2023.  *See* Ex. A, Order Form.

70.    The Order Form specifically incorporates both the MSA and the Custodial Agreement by reference.  *Id.* ("This Order Form is governed by the Prime Trust Master Services Agreement set forth at: https://www.primetrust.com/legal/msa, the Service Schedule(s) and Attachment(s) that are applicable based on the services provided by Prime Trust under this Order Form (located at: https://www.primetrust.com/legal/msa-service-schedules), and the attached Fee Schedule, all of which are incorporated into this Order Form by this reference.").

71.    DAR reviewed the MSA and communicated to Prime that DAR found the terms of the MSA acceptable.

72.      On April 25, 2023, Matthew Leidlein, DAR's Managing Director and signatory to

the Order Form, stated, "The MSA looks fine":



73.      The Order Form states that the MSA and the Custodial Agreement "shall supersede

and replace any prior agreement(s) that may be in place between [DAR] and Prime Trust with

respect to Prime Trust's services."  Ex. A, Order Form.

74.      On May 30, 2023, an internal Prime communication referred to DAR's execution

of the Order Form stating that DAR is "a long-time GUI client [that] has ***used our payment rails***

*only*" (emphasis added).  It also noted that DAR had requested a lower fee as DAR was only "using [Prime] for wires."



This internal communication made it clear that DAR was not using Prime for trust or fiduciary services and was only using Prime for "payment rails".

### D.    The Agreements Form a Debtor-Creditor Relationship Between Prime and DAR

75.    The Agreements make clear that Prime and DAR formed a debtor-creditor relationship—not a trust or fiduciary relationship.

76.    The Agreements explicitly state that they do not create a trust or fiduciary relationship between Prime and DAR.

77.    For example, the MSA states: "The Parties are independent contractors.  The Agreement does ***not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties***" and that "***nothing in the Agreement, express or***

*implied is intended to give rise to any third-party beneficiary*." Ex. B, MSA, § 14.1 (emphasis added).

78.     Prime, pursuant to the Custodial Agreement, also had complete discretion to invest, rehypothecate, hold and register in its own name, and otherwise transfer or use the assets provided by DAR to Prime as well as retain the profits derived from the assets that DAR transferred to Prime.  This further indicates that Prime and DAR maintained a debtor-creditor relationship at all times.

79.     For example, the Custodial Agreement permitted Prime to:

> *[O]therwise use or invest such cash or Fiat Currency at Prime Trust's own risk. Without limiting the foregoing, **Prime Trust may use such Fiat Currency to purchase securities or other assets that it may hold and register in its own name or in the name of its nominee and pledge, repledge, hypothecate, rehypothecate, sell, or otherwise transfer or use any amount of such securities or other assets with all attendant rights of ownership and without any obligation to maintain in its possession or control a like amount of cash or Fiat Currency*[.]

Ex. C, Custodial Agreement, § 2.7(b) (emphasis added).

80.     The Custodial Agreement also provided that DAR expressly agreed "that any such earnings, income, or compensation shall be retained by Prime Trust, and no portion of any such earning, income, or compensation shall be paid to or for customer . . ." *Id.*

81.     Thus, the Agreements make clear that Prime and DAR entered a debtor-creditor— and not a trust or fiduciary—relationship.

**E.     The Transfers are Avoidable Under the Bankruptcy Code**

82.     Section 547(b) of the Bankruptcy Code provides that a trustee may avoid certain transfers of a debtor's property that occurred within 90 days of the petition date.  *See* 11 U.S.C. § 547(b).

83.     On June 16, 2023, DAR transferred $10,000,000.00 to Prime (the "Incoming DAR Transfer"):



84.     DAR initiated the Incoming DAR Transfer from a bank account at Texas Capital Bank NA.  *See* Ex. D, Brennan Decl., ¶ 66.

85.     Pursuant to the Agreements, the Incoming DAR Transfer created a debt that Prime was obligated to repay to DAR.

86.     Prime did not hold the $10,000,000.00 it received via the Incoming DAR Transfer in trust or in any fiduciary capacity for DAR.  *See id.* ¶¶ 66–68.

87.     Instead, Prime held the Incoming DAR Transfer in a bank account in Prime's own name.

88.     On June 20, 2023, Prime transferred $5,000,000.00 to DAR via wire:



89.     On June 21, 2023, Prime transferred an additional $4,497,500.00 to DAR:



90. Thus, Prime made two Transfers to DAR during the Preference Period totaling $9,947,500.00.

91. As the Incoming DAR Transfer created an obligation by Prime to repay the amounts transferred to it by DAR, the Transfers constituted payments on account of an antecedent debt.[13]

92. The Transfers effectively zeroed out all or substantially all of the $10,000,000.00 that DAR had transferred to Prime earlier in the Preference Period via the Incoming DAR Transfer.[14]

93. The Transfers occurred less than 90 days prior to the Petition Date and thus occurred during the Preference Period.

94. The Transfers were transfers within the meaning of 11 U.S.C. § 547(b).

95. Upon the commencement of the Chapter 11 Cases, the Debtors' interest in the Transfers became property of the Debtors' estates. *See* 11 U.S.C. § 541(a).

96. DAR has not repaid all or a part of the value of the Transfers.

**F.     DAR Cannot Trace the Fiat It Transferred to Prime**

97. DAR would be unable to trace and identify the fiat currency it transferred to Prime, including the $10,000,000.00 that DAR sent to Prime through the Incoming DAR Transfer, because Prime commingled assets in a way that makes it impossible to segregate which assets were provided to Prime by which specific customers.

---

[13]   The amounts stated herein for the Transfers are based on reasonable due diligence in the circumstances of the case and account for Defendants' known or reasonably knowable affirmative defenses under 11 U.S.C. § 547(c), such as the subsequent new value or ordinary course of business defenses. Prime has reviewed all of DAR's transaction activity during the Preference Period, which consists of only one incoming and two outgoing Transfers described above. Further details surrounding these Transfers is provided in the Brennan Decl. *See* Ex. D, Brennan Decl., ¶¶ 60–88. Prime also has reviewed DAR transaction data dating back to May 15, 2021.

[14]   As further described in this Complaint and the Brennan Decl., due to Prime's commingling of assets, the $9,947,500.00 that Prime transferred to DAR via the Transfers was transferred from a commingled, omnibus account that contained fiat from multiple customers—not just DAR. *See id.*, ¶¶ 60–88.

98.     Prime did not segregate fiat that customers transferred to it into separate bank accounts held for separate customers; instead, Prime held such fiat in commingled, omnibus bank accounts.  *See* Ex. D, Brennan Decl., ¶¶ 17–19.

99.     Prime maintained omnibus bank accounts primarily at BMO Harris Bank, N.A. ("BMO"), Cross River Bank ("CRB"), and Signature Bank ("Signature").  *See id.* ¶¶ 16–19; *see also* Treasury Master Services Agreement, dated January 14, 2022, between Prime Trust, LLC and BMO Harris Bank N.A. (the "BMO Agreement").[15]

100.    In addition, a portion of the fiat that Prime generated from its business activities, which were used to pay Prime's operational expenses, also was held in the same omnibus bank accounts that held fiat that customers had transferred to Prime.  *See* Ex. D, Brennan Decl., ¶ 17.

101.    The BMO Agreement does not state that Prime held assets with BMO "in trust for" or "for the benefit of" any party other than Prime.  *See* Ex. E, BMO Agreement.

102.    Instead, the BMO Agreement specifically provides that it "***is not for the benefit of any other person and no other person shall have any rights against [Prime] or [BMO Harris] hereunder***."  *Id.,* § 15(e) (emphasis added).

103.    Indeed, in Prime's onboarding documents with BMO, Prime designated "Prime Trust, LLC" as the sole "Legal Entity for Which Beneficial Ownership is Being Provided."  *See* Certification Regarding Beneficial Owners of Legal Entity Customers between Prime Trust, LLC and BMO Harris Bank N.A (the "BMO Certification").[16]

104.    Moreover, Prime regularly transferred fiat between its various bank accounts, further commingling funds.  *See* Ex. D, Brennan Decl., ¶¶ 20–25.

---

[15]   A copy of the BMO Agreement is attached as Exhibit E.

[16]   A copy of the BMO Certification is attached as Exhibit F.

105.    For example, Prime used one bank account it held with BMO Harris primarily to make wire transfers ("BMO x3077").  *See id.*, ¶ 21.

106.    BMO x3077 held commingled funds that it regularly received from other Prime bank accounts and from other Prime customers.  *See id.*, ¶ 22.

107.    At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("BMO x9934"), because the latter account offered a higher rate of interest.[17]  *See id.*, ¶ 24.

108.    Prime would regularly transfer funds into BMO x3077 from BMO x9934 on an as-needed basis to make outgoing wire transfers.  *See id.*, ¶ 21.

109.    The vast majority of funds Prime held in BMO x9934 came from transfers from BMO x3077.  *See id.*, ¶ 25.  Because the funds in BMO x3077 were commingled, this meant that BMO x9934 also contained commingled funds.  *Id.*

110.    In addition to commingled funds from BMO x3077, BMO x9934 also contained some funds transferred from other sources, such as Prime's accounts at CRB and/or Signature.  *Id.*

111.    Prime's accounts at CRB and Signature operated in a similar manner as BMO x3077.  Specifically, Prime's CRB and Signature accounts commingled funds that were transferred to them from Prime's other, commingled, omnibus accounts and commingled funds that Prime customers had transferred to the accounts directly.  *Id.*

---

[17]   BMO's terms and conditions provided that "interest-bearing accounts will bear interest at annual rates that we may establish and change from time to time in our discretion."  *See* BMO Harris Bank N.A. Commercial Account Agreement Terms and Conditions dated July 2021, attached as Exhibit G, § 25.  Because Prime designated itself as the beneficial owner of its BMO accounts, Prime was entitled to the interest produced by these accounts (consistent with the Agreements).

112.    Prime used one CRB account in the same way it used BMO x3077, except that Prime funded the CRB account on an as-needed basis to make transfers via automated clearing house ("ACH") instead of via wire.  *See id.*, ¶ 27.

113.    Thus, Prime appears to have used its different bank accounts depending on what type of transfer it needed to make.  *See id.*, ¶ 28.

114.    Prime moved funds between different accounts, regardless of the source of the funds, on an as-needed basis to satisfy different wire and ACH transfers.  *Id.*

115.    Prime typically made transfers between its bank accounts in round numbers, without reference to any specific transactions, which suggests that Prime simply moved funds between its internal bank accounts on an estimated, as-needed basis instead of in response to specific transaction activity.  *See id.*, ¶ 26.

116.    Prime also would transfer funds between bank accounts that were primarily used for Prime's corporate operations and bank accounts containing assets that had been provided to Prime by its customers.  *See id.*, ¶ 20.

117.    Prime paid some corporate expenses from bank accounts that were primarily contained assets transferred to Prime by its customers.  *See id.*, ¶ 29.

118.    Because Prime did not segregate fiat transferred from one customer from fiat transferred from another customer, or from fiat generated from Prime's business operations, the only way Prime attempted to keep track of what it owed to each of its customers was by noting the amounts it owed to customers on its Ledger.  *See id.*, ¶¶ 17–19.

119.    However, Prime internal cash management practices made identifying which bank account transfers correspond with which specific customer transactions reflected on Prime's Ledger increasingly difficult.  *Id.*

120.    ███████████ ("████"), Prime's former Chief of Regulatory Affairs, testified that Prime employees simply checked Prime's Ledger to determine the amounts that Prime owed to its customers:

> Q:    And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?
>
> A:    I would pull the general ledger record out of the Prime Trust Core system.

███████████████████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "████████."), 89: 19–25.

121.    Prime maintained substandard reconciliation processes throughout its history, including with respect to its Ledger.  *See* Ex. D, Brennan Decl., ¶¶ 30–37.  This further hindered the ability of Prime or anyone else to specifically identify which funds were transferred to Prime by which customer.  *Id*.

122.    Prime did not perform regular reconciliations of its assets, and, at least prior to March 2021, any reconciliations that Prime conducted were manual.  *See id.*, ¶ 30.

123.    Former Prime employees testified that Prime commingled assets transferred to it by customers and that Prime's reconciliation processes were poorly maintained.

124.    ████ testified that "[r]econciliations were not being done in a timely manner." ████ Dep., 38: 23–24.

125.    ███████████ ("████"), Prime's former Chief Financial Officer, testified:

> Q:    Are you aware of any instances in which what would be considered customer assets were commingled with company assets in an account?
>
> A:    I think there were instances where that did happen based off of the management in the financial operations team where we might have had balances that they might have commingled, but I don't remember the—I don't remember how that happened.

Deposition of ████████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

126.    ██████ also testified that "[i]t would not surprise" him if customer assets were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been." *See id.*, 213:15–22.

127.    █████████ ("████"), Prime's former Senior Vice President of Operations and Reconciliations, also testified regarding Prime's reconciliations processes both before and after March 2021:

> Q:    When you say it was a problem, what do you mean?
>
> A:    There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .

████ Dep., 19:23–20:5.

128.    ██████ prepared a report for a July 12, 2021 audit committee meeting which identified the risks associated with Prime's handling of assets, reconciliation practices, and general mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

## 2   Finding and Response Summary Matrix

| Risk | Reference | Finding | Target | Response | Completed | Verified |
|------|-----------|---------|--------|----------|-----------|----------|
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

129.    The below testimony from ██████ demonstrates that not only did Prime hold customer assets in an omnibus, commingled manner, but also that this approach resulted in Prime's own employees being incapable of determining exactly where any assets transferred by a particular customer were located:

Q:    And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—

A:    It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.

Q:    And what does that mean to you, a client to have an omnibus account?

A:      It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

Q:      And that was done at Prime Trust?

A:      It was done at Prime Trust.  It wasn't done very frequently, but there were— there were omnibus accounts at Prime Trust.

Q:      And do you know who was responsible for those accounts?

A:      I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.

███████ Dep., 205:19–207:3.

130.    Another example of the confusion in tracing specific assets that customers had transferred to Prime is demonstrated in the below internal Prime correspondence from December 2022.  In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which omnibus accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy transfer requests from another customer:



131.     responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":



132.         ████████, Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which assets and that they were "*not able to specify what customer is out the funds due to our omnibus structure*":



133.    Because of Prime's commingling of fiat and poor recordkeeping procedures, it is impossible for Prime, DAR, or anyone else to trace and specifically identify the fiat that DAR transferred to Prime, including the $10,000,000.00 that DAR transferred to Prime through the Incoming DAR Transfer.

134.    As detailed in the Brennan Decl., DAR sent the Incoming DAR Transfer to BMO x3077 on June 16, 2023.  *See* Ex. D, Brennan Decl., ¶ 65.

135.    Once in Prime's custody, the Custodial Agreement permitted Prime, "for convenience, [to] take and hold title to Custodial Property or any part thereof in [Prime's] own name with [DAR's] ownership of Custodial Property segregated on its books and records." *See* Ex. C, Custodial Agreement § 2.9.

136.    The cash movement to and from BMO x3077 on June 16, 2023, is summarized in the following table:

| June 16, 2023 Activity | | |
|---|---|---|
| **Transaction** | **Count** | **Amount** |
| Transfer In | 56 | 31,730,544.81 |
| Transfer Out | 91 | (32,073,000.30) |

*See* <u>Ex. D</u>, Brennan Decl., ¶ 72.

137.    At the end of the day on June 16, 2023, BMO x3077 held $295,980.74.  *Id.*

138.    This means that all—or virtually all—of the $10,000,000.00 that DAR transferred to the Prime BMO x3077 account on June 16, 2023, was immediately transferred to other Prime bank accounts that same day.  *Id.*

139.    Prime executed the Transfers from BMO x3077 on June 20, 2023 and June 21, 2023.  *See id.*, ¶¶ 79–80.

140.    As Prime transferred the $10,000,000.00 Incoming DAR Transfer from BMO x3077 to other Prime bank accounts the same day that it received these funds from DAR, Prime necessarily used commingled fiat from other sources (primarily BMO x9334) to facilitate the Transfers to DAR during the Preference Period.  *See id.*, ¶¶ 84–86.

141.    As discussed above, BMO x9934 held commingled funds because it received and then commingled:  previously commingled funds from BMO x3077; fiat transferred directly by Prime customers; and commingled funds from various Prime bank accounts, including Prime's bank accounts at CRB and Signature.  *Id.*

142.    Thus, because the fiat contained in Prime's various bank accounts were commingled, it is impossible to determine the ultimate source of the funds that Prime used to make the Transfers to DAR.

**G.**      **The 98f Wallet**

143.    In December 2021, one of Prime's largest customers ("Customer") requested a transfer of 5,867.71 ETH (worth approximately $23,600,000 at the time) from Prime.  *See id.*, ¶ 43.

144.    In attempting to satisfy Customer's transfer request, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its digital wallets:



145.    Further investigation revealed that, for approximately eight months, Prime had been permitting Customer to transfer significant amounts of ETH to a "multi-sig" digital wallet that Prime no longer was able to access—the 98f Wallet.  *See id.*, ¶ 43.

146.    Specifically, in December 2021, Prime discovered that Customer had already transferred 11,081 ETH (approximately $44,550,000 at the time) to the 98f Wallet.  *See id.*, ¶ 44.

147.    In or around December 2021, Prime discovered that nobody at the company had any knowledge about how to access the 98f Wallet.  *See id.*, ¶ 43.

148.    It was unclear to those at the company who the signers for the 98f Wallet were or how Prime could access the 98f Wallet.  Prime did not possess and could not locate the hardware

devices which stored the private keys necessary to access the 98f Wallet. Prime also did not possess and could not locate the seed phrases associated with these physical hardware devices.

149.    As such, Prime had no way of accessing the 98f Wallet and the crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

150.    Prime was concerned about the negative impacts and consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a wallet containing a significant amount of crypto.

151.    To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, omnibus bank accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") to satisfy Customer's transfer requests. *See id.*, ¶ 45.

152.    To fund the ETH purchases from Liquidity Provider, Prime used fiat currency that had been transferred to Prime by other customers which was in several of Prime's omnibus, commingled bank accounts. *Id.*

153.    The decision to use this commingled fiat to fund Prime's purchase of replacement ETH from Liquidity Provider is described in the below deposition testimony of Prime's former Chief Operating Officer, █████████:





Q:

A:

Deposition of ▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 10, 2023), 92:25–93:18.

154.    Between December 23, 2021 and March 19, 2022, Prime executed eight different purchases of ETH from Liquidity Provider, totaling 23,778 ETH worth $76,367,548.00 USD based on the value of ETH at the time of each respective purchase. *See* <u>Ex. D</u>, Brennan Decl., ¶ 47:

| Date | Cryptocurrency | USD Value as of Purchase Date |
|---|---|---|
| 12/23/2021 | 3,000 ETH | $11,958,000 |
| 12/31/2021 | 3,250 ETH | $12,158,250 |
| 01/06/2022 | 2,900 ETH | $10,071,700 |
| 01/22/2022 | 1,930.5019305 ETH | $5,000,000 |
| 03/11/2022 | 1,800 ETH | $4,644,000 |
| 03/14/2022 | 3,250 ETH | $8,524,750 |
| 03/15/2022 | 3,000 ETH | $8,043,000 |
| 03/19/2022 | 4,647.22 ETH | $15,967,847.90 |

155.    The funds for each of these ETH purchases came from Prime's omnibus bank accounts, which held commingled fiat from both Prime's customers and revenues generated from Prime's business activities. *See id.*, ¶ 48.

**H.    Prime Corrupted and Falsified its Ledger**

156.    Executives at Prime made the decision to falsify entries in the Ledger to conceal the fact that Prime had used fiat that had been transferred to it by other customers to satisfy Customer's withdrawal requests related to the 98f Wallet.

157.    Prime executives discussed how to hide these transactions from auditors at the Nevada FID:



158.    In his deposition testimony concerning the above internal Prime communication, ███ confirmed that Prime executives intentionally chose to settle and record the purchases of ETH from Liquidity Provider on Prime's Ledger as opposed to externally transferring funds to Liquidity Provider. *See* ███ Dep., 153:8–13.

159.    Specifically, Prime settled its ETH purchases from Liquidity Provider by "credit[ing]" Liquidity Provider's customer balance with Prime with fiat amounts equivalent to each ETH purchase.

160.    To "credit" the Liquidity Provider's fiat balance with Prime, Prime had to input a "contribution" on its Ledger to make it appear as if the Liquidity Provider had wired fiat to Prime. In reality, no funds were moving from one account to another in connection with the ETH purchases.

161.    ███ testified:



A:

A:

Q:

A:

Q:

A:

Q:

A:

████ Dep., 155:11–156:9.

162.    These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected on Prime's Ledger and the amount of fiat that Prime held in its bank accounts.  *See* Ex. D, Brennan Decl., ¶ 52.



163. ████ further testified about Prime's internal "inflat[ed]" Ledger compared to assets in Prime's bank accounts:



████ Dep., 144:11–20; 146:7–15.

164. ████ explained that Prime chose to record its purchases of ETH from Liquidity Provider to satisfy the transfer requests of Customer on Prime's Ledger because that approach made it easier for Prime to avoid detection from Nevada FID:



A:    █████████████████████████████████

█ Dep. 152:18–153:13.

165.    Prime executives seem to have undertaken efforts to make Ledger entries appear as if Prime received incoming wire transfers to justify the increase in fiat account balances for the Liquidity Provider.  *See* Ex. D, Brennan Decl., ¶ 53.

166.    As demonstrated below, Prime's Ledger falsely displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that Prime credited to Liquidity Provider to fund the ETH Purchases:



167.    Prime's bank account statements do not reflect any of these wire transfers because they did not actually occur.[18]  *See id.*, ¶ 55.

168.    Prime's Ledger shows incoming wire transfers to Prime, and specifically to Liquidity Provider's balance with Prime, in the amounts of $11,958,000 on December 23, 2021 and $12,158,250 on December 31, 2021.

169.    These transfers correspond exactly with the value of the first two ETH purchases that occurred on these two days.

---

[18]    The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 23, 2021, is attached as Exhibit H.  The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 31, 2021, is attached hereto as Exhibit I.

170.    However, these incoming wire transfers are not recorded in Prime's bank account statement for December 2021.

171.    The reason for this is simple: these incoming wire transfers never occurred and instead were manufactured by Prime to conceal its use of customer-transferred, commingled fiat to fund the purchases of ETH from Liquidity Provider to satisfy Customer's transfer requests.

172.    These false accounting entries were confirmed by ▮▮▮, who also recognized that Prime's bank account statements would not reflect incoming wire transfers shown on Prime's Ledger:



▮▮ Dep., 164:22–165:10; 166:5–15.

173.    Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries in its Ledger to conceal its use of commingled fiat to purchase replacement ETH.  After Prime executives obfuscated Prime's internal records, it became simply impossible to untangle or segregate assets of different customers and assets Prime generated from its business operations.

174.    As such, neither Prime nor DAR will be able to locate, segregate, or otherwise identify any of the assets that DAR provided to Prime for custody, including the $10,000,000.00 that DAR sent to Prime via the Incoming DAR Transfer.

## I.    Prime's Financial Conditions Spiraled Downward and Culminated in Prime Filing the Chapter 11 Cases

175.    Prime ultimately reported the 98f Wallet issues to Nevada FID between September and November 2022.

176.    In the weeks leading up to the Petition Date, including during the Preference Period, Prime personnel had multiple meetings with Nevada FID to determine how to handle the solvency issues Prime was experiencing.

177.    At the same time, and again during the Preference Period, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing— were leaking to the crypto and financial markets.

178.    For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime.  *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK (Jun. 8. 2023), https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/.  CoinDesk's report specifically noted

that "Prime Trust had been the subject of some speculation with people online suggesting the firm

was facing bankruptcy." *Id.*

179.    On June 20, 2023, DAR executed the first of the Transfers.

180.    On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations

of NRS 669 (the "Cease and Desist Order").  Nevada FID found that Prime was "operating at a

substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals." *See In re*

*Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21,

2023),            https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-

%20C%20and%20D%206.21.23.pdf.  Nevada FID ordered Prime to cease accepting all fiat and

crypto deposits. *Id.*

181.    The same day that Nevada FID issued the Cease and Desist Order (June 21, 2023),

DAR executed the second of the Transfers.

182.    Two days after the Cease and Desist Order, BitGo canceled its acquisition of Prime.

One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks

amid mounting concerns over its business." *See* Jamie Crawley & Danny Nelson, *Crypto Custody*

*Firm BitGo Cancels Acquisition of Rival Prime Trust*, CoinDesk (Jun. 22, 2023),

https://www.coindesk.com/business/2023/06/22/cryptp-custody-firm-bitgo-cancels-prime-trust-

acquisition/.

183.    On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver,

Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth

Judicial District Court of the State of Nevada (the "Nevada Court").  *See Sandy O'Laughlin, in her*

*capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial*

*Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime*

*Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023), https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prim e%20Core%20Technologies%20et%20al%20Petition.pdf. The Nevada FID Petition directed Prime to cease and desist all retail trust activities. *Id.*

184. The Nevada FID Petition also contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from customers in commingled accounts.

185. Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its ***omnibus customer accounts***." *Id.* at 6 (emphasis added).

186. The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals." *Id.* at 10. Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)." *Id.* at 7.

187. On July 14, 2023, the Nevada Court placed Prime under receivership.

188. On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

**J.    The Transfers are Avoidable as Preferential Transfers**

189. Section 547 of the Bankruptcy Code authorizes a debtor-in-possession to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

190. First, the transfer must be "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1).

191. Second, the transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2).

192.    Third, the transfer must have been "made while the debtor was insolvent." 11 U.S.C. § 547(b)(3).

193.    Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition.  11 U.S.C. § 547(b)(4).

194.    Finally, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would receive in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made.  11 U.S.C. § 547(b)(5)(A)–(C).

195.    The Transfers were transfers of an interest of Prime in property.

196.    The Transfers were made to or for the benefit of DAR, a creditor of the Debtors, by virtue of the Parties' debtor-creditor relationship pursuant to the Agreements.

197.    At the time of the Transfers, Prime owed DAR.  Thus, Prime's Transfers were made on the account of an antecedent debt.

198.    The Transfers were made while Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

199.    The Transfers were made on or within the 90-day period immediately preceding the Petition Date (*i.e.*, between May 16, 2023 and August 14, 2023).

200.    Prime held approximately $43 million worth of assets at the Petition Date.  If not avoided, the Transfers will enable DAR to receive more than DAR would have received on account of its claim in a hypothetical liquidation under chapter 7 had Prime not made the Transfers during the Preference Period in satisfaction of Prime's antecedent debt to DAR.  *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

201.   Accordingly, the Transfers to DAR on or within the 90-day period immediately preceding the Petition Date constitute preferential transfers pursuant to section 547(b) of the Bankruptcy Code that are subject to avoidance pursuant to section 550 of the Bankruptcy Code.

## CAUSES OF ACTION

### Count I
### Avoidance of Preferential Transfers, 11 U.S.C. § 547(b)

202.   Prime repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

203.   Prime has conducted reasonable due diligence into the Transfers, including, *inter alia*, by reviewing the books and records of Prime and other information regarding the Transfers and DAR's other transaction activity with Prime.

204.   Prime also has conducted reasonable due diligence into the known or reasonably knowable affirmative defenses that DAR could assert, including DAR's potential defenses under section 547(c) of the Bankruptcy Code.

205.   The Transfers to DAR totaled $9,947,500.00 USD.

206.   The Transfers were made on account of a demand by DAR.

207.   The Transfers to DAR were transfers of an interest in property of Prime.

208.   The Transfers were made for or on account of an antecedent debt owed by Prime before the Transfers to DAR were made—namely, the antecedent debt Prime owed to DAR that was created by the Incoming DAR Transfer—and the Transfers related to that antecedent debt.

209.   Prime made the Transfers to DAR to or for the benefit of DAR.

210.   At the time of the Transfers, DAR was a creditor of Prime within the meaning of section 101(10) of the Bankruptcy Code.  DAR received the Transfers, or alternatively the Transfers were made for its benefit.

211.    The Transfers were made to DAR within the 90-days period immediately preceding the Petition Date.

212.    At the time of the Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code.

213.    If not avoided, the Transfers would enable DAR to receive more than DAR would have received in a hypothetical chapter 7 case had Prime not made the Transfers.

214.    DAR has not repaid all or a part of the value of the Transfers.

215.    Each of the Transfers constitutes a preferential payment subject to avoidance under 547(b) of the Bankruptcy Code.

### Count II
### Property Recovery on Account of Preferential Transfers, 11 U.S.C. § 550

216.    Prime repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

217.    Prime is entitled to avoid the Transfers pursuant to section 547(b) of the Bankruptcy Code.  DAR was the initial transferee of such transfer, or the immediate or mediate transferee of such initial transferee, or the person for whose benefit such transfer was made.

218.    Accordingly, Prime is entitled to recover from DAR $9,947,500.00 USD—the value of the Transfers—pursuant to section 550 of the Bankruptcy Code, *plus* interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court grant the following relief:

219.    Enter an order finding that the Transfers are avoidable preferential transfers under 11 U.S.C. § 547 and that Plaintiff is entitled to recover the Transfers under 11 U.S.C. § 550;

220.    Award Plaintiff no less than $9,947,500.00 USD, plus the value of any additional avoidable transfers made to DAR during the Preference Period that Plaintiff learns about, through discovery or otherwise;

221.    Award Plaintiff attorneys' fees, pre- and post-judgment interests, and costs of suit; and

222.    Award Plaintiff all other relief, at law or equity, to which it may be entitled.


Dated:   October 7, 2024
      Wilmington, Delaware

MCDERMOTT WILL & EMERY LLP

*/s/Maris J. Kandestin*
Maris J. Kandestin (No. 5294)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711
Email:      mkandestin@mwe.com

-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444
Email:      dazman@mwe.com
            jbevans@mwe.com
            ggriffith@mwe.com

pkennedy@mwe.com
jaminov@mwe.com

-and-

Gregg Steinman (admitted *pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131
Telephone: (305) 358-3500
Facsimile:  (305) 347-6500
Email:      gsteinman@mwe.com

*Counsel to the PCT Litigation Trust*